# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 18-584V
### Filed: June 24, 2021
PUBLISHED

|  |  |
|---|---|
| ROBERT O'LEARY, M.D., | Special Master Horner |
| Petitioner, | |
| v. | Ruling on Entitlement; Shoulder Injury Related to Vaccine Administration; SIRVA; Influenza Vaccine; Onset; Adhesive Capsulitis |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Amy A. Senerth, Muller Brazil, LLP, Dresher, PA, for petitioner.*
*Naseem Kourosh, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

On April 25, 2018, petitioner, Robert O'Leary, M.D., filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10-34 (2018)[2] ("the Act" or "the program"). (ECF No. 1.) Petitioner alleges that he suffered a Table Injury of shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine he received on October 7, 2016. (*Id.*) For the reasons set forth below, I find that petitioner is entitled to compensation for a Table Injury of SIRVA.

### I.    Procedural History

Petitioner filed his petition, several medical records, and a sworn affidavit on April 25, 2018. (ECF No. 1; Exs. 1-4.) This case was initially assigned to the Special

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

Processing Unit ("SPU").  (ECF No. 6.)  Petitioner filed a supplemental affidavit on June 12, 2018.  (ECF No. 8; Ex. 5.)

On March 1, 2019, respondent filed a status report indicating that he was willing to engage in settlement discussions.  (ECF No. 17.)  However, petitioner filed a status report on July 3, 2019 indicating that the parties were unable to reach an agreement and requesting that respondent file a Rule 4(c) report.  (ECF No. 26.)

Respondent filed his Rule 4(c) report on July 31, 2019, recommending against compensation.  (ECF No. 28.)  Respondent explained that petitioner's alleged vaccine injury does not fit the criteria required for a Table SIRVA.  (*Id.* at 1, 4.)  Specifically, respondent suggested that the medical records do not demonstrate that petitioner's symptoms began within 48 hours of vaccination and that alternate causes explain petitioner's shoulder pain.  (*Id.* at 4.)

This case was reassigned to Special Master Roth on August 15, 2019.  (ECF No. 29.)  Petitioner filed two supplemental affidavits on November 11, and December 6 of 2019, (ECF Nos. 32, 33; Exs. 6, 7), and an expert report from physical medicine and rehabilitation specialist, Dr. Naveed Natanzi, D.O., on January 27, 2020.  (ECF No. 34; Ex. 8.)  Respondent filed a responsive expert report from orthopedic surgeon Dr. Brian Feely M.D. on April 27, 2020.  (ECF No. 35, Ex. A.)  Petitioner filed another supplemental affidavit on April 30, 2020.  (ECF No. 36; Ex. 10.)

On July 16, 2020, petitioner filed a status report requesting a ruling on entitlement.  (ECF No. 39.)  Petitioner then filed a motion for a ruling on the record on August 17, 2020.  (ECF No. 40.)  Respondent filed a response to petitioner's motion on October 1, 2020.  (ECF No. 42.)  Petitioner did not file a reply.

This case was reassigned to my docket on January 26, 2021.  (ECF No. 44.)  On January 28, 2021, I issued a scheduling order indicating that I intend to act on the pending motion for a ruling on the record unless the parties advised that they wished to resume settlement discussions.  (ECF No. 45.)  Respondent filed a status report on March 11, 2021 indicating that the parties were unable to reach an agreement regarding settlement and requesting a ruling on the record.  (ECF No. 47.)  Accordingly, this case is now ripe for a ruling on entitlement.[3]

---

[3] I have determined that the parties have had a full and fair opportunity to present their cases and that it is appropriate to resolve this issue without a hearing. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Secretary of Health & Human Services*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record.").

## II.     Factual History

### a.  As reflected in petitioner's medical records

Prior to his vaccination, petitioner was a relatively healthy 51-year old man with no significant recent medical history.  Petitioner had not sought medical treatment in the three years prior to the vaccination at issue in this case. (Ex. 5, p. 1.)

Petitioner received a flu vaccination on October 7, 2016.  (Ex. 1.)  He was initially seen by Dr. John J. Brennan on November 9, 2016 for left shoulder pain.  (Ex. 2, p. 1.)  Dr. Brennan noted that petitioner "had an old history of a trauma to his shoulder when he fell on it but recovered nicely and had no pain." (*Id.*)  Petitioner reported that he had recently developed new aching pain in his left shoulder causing difficulty with overhead activities and nighttime pain.  (*Id.*)  On examination, petitioner exhibited some deformity in both shoulders at the A.C. joint.  He also showed full active forward elevation with a mildly positive impingement sign in his left shoulder.  Petitioner was able to externally rotate his shoulder and resist forward flexion with slight pain.  (*Id.* at 2.)  Dr. Brennan diagnosed petitioner with left shoulder pain and administered a corticosteroid injection. (*Id.*)

Petitioner received a left shoulder MRI without contrast on January 27, 2017.  (*Id.* at 31.)  Petitioner's MRI revealed supraspinatus and infraspinatus tendinosis with low-grade partial-thickness articular sided tearing, subscapularis tendinosis, moderate degeneration of the acromioclavicular joint, degeneration of the glenohumeral joint with subchondral cyst formation truncation of the free edge of the posterior superior glenoid labrum, and mild tendinosis of the intra-articular portion of the long head of the biceps tendon.  (Ex. 2, p. 32.)

Petitioner returned to Dr. Brennan for a follow up exam on February 5, 2017.  (*Id.* at 5-8.)  He reported significant stiffness in his shoulder and pain in his biceps.  (*Id.* at 5.)  Dr. Brennan explained that petitioner had some rotator cuff tearing, bicep tendinopathy, and elements of adhesive capsulitis.  (*Id.* at 6.)  Petitioner reported that the corticosteroid injection provided some relief for a few weeks, but that his pain had returned and chose to follow up with Dr. Brennan after considering his treatment options.  (*Id.* at 5, 7.)

On March 9, 2017, petitioner was seen by Dr. Schrank for evaluation of his shoulder.  (Ex. 2, pp. 9-12.)  Petitioner reported that he had noticed a progressive loss in range of motion over the past five months, and that he now experienced intermittent and moderate anterior lateral arm pain.  (*Id.* at 9.)  On exam, petitioner exhibited tenderness at the scapula and along the long head of the biceps tendon and supraspinatus. (*Id.*)  His supraspinatus strength was recorded as 4/5 and internal and external rotation strength as 5/5.  Petitioner showed positive Neer's and Hawkins signs, and negative speeds test and Yergasons signs. (*Id.* at 10.)  Dr. Schrank observed a grade I SLAP tear and a type II acromion.  (*Id.* at 10-11.)  Petitioner was diagnosed with a left frozen shoulder and referred to physical therapy.  (*Id.* at 11, 30.)

Petitioner began physical therapy on March 21, 2017. (Ex. 3, p. 1.) His initial examination notes that his pain and stiffness began "in October" and "shortly after receiving a flu vaccine." (*Id.*) The onset date was recorded as October 15, 2017; however, the basis for this date is unclear as the date of petitioner's vaccination is not included in the accompanying history nor is any other date certain for onset discussed. (*Id.*) Petitioner's exam showed tenderness to palpation, considerable restriction, and decreased strength in his left shoulder. (*Id.* at 2.) He was assessed with left shoulder adhesive capsulitis, major motion loss, posterior cuff and bicep tenderness, and weakness of rotator cuff and scapular stabilizers. (*Id.*) Petitioner returned for two more physical therapy sessions on March 23 and 30 of 2017. (*See* Ex. 3, pp. 4-7.) During these visits, petitioner reported that he was complying with his home exercise program and tolerating treatment, but still had difficulty sleeping due to his pain. (Ex. 3, pp. 4, 6.)

On April 13, 2017, petitioner returned for a follow-up exam. (Ex. 2, p. 13.) Petitioner reported that he continued to have restricted motion in his left shoulder, and that he felt his condition was getting worse. Petitioner reported that his pain interrupted his sleeping and interfered with his activities of daily living ("ADLs"). (*Id.*) Petitioner's exam revealed tenderness of the medial border of the scapula and tenderness of the superomedial angle of the scapula, tenderness on the long head of the biceps tendon, and supraspinatus tenderness. (*Id.* at 14.) Petitioner received a corticosteroid injection at this visit. (*Id.* at 15.)

Petitioner returned for another follow-up on June 20, 2017. (*Id.* at 18.) He reported the same symptoms as he did on his prior exam and that he believed physical therapy increased his pain. Petitioner received another corticosteroid injection at this visit. (*Id.* at 18, 20.) Petitioner's final medical record documents a follow-up on July 27, 2017. Petitioner again reported that his range of motion had not changed and that he was doing home exercises as tolerated. (Ex. 2, p. 23.) Petitioner was advised of surgical options, but chose to manage his pain with home exercises instead. (*Id.* at 25.)

### b. As reflected in the Affidavits

Petitioner has submitted a number of affidavits during the pendency of this case. In his initial affidavit, petitioner addressed the general requirements of the Vaccine Act, stating that he received a flu vaccine on October 7, 2016, that he received it at Great South Bay Endoscopy in Patchogue, New York, that he sustained a left shoulder injury caused by his vaccine, that he suffered effects of his injury for over six months, and that he has never received an award or settlement for his vaccine injury. (Ex. 4, p. 1.)

Petitioner's first supplemental affidavit incorporated the entirety of his original affidavit. This affidavit adds that petitioner's primary care physician is Dr. Robert Roche, but that he had never seen Dr. Roche, and had never been to the doctor in the three years before receiving his October 7, 2016 flu vaccination. Petitioner also explains that he had a previous shoulder injury when he was 14 years old, that it was likely a sprain, and that it resolved within 3-4 weeks. (Ex. 5, p. 1.)

4

Petitioner's second supplemental affidavit adds that petitioner was working per diem as an anesthesiologist at Great South Bay Endoscopy when he received his flu shot, and that he did not file a worker's compensation claim in connection to his vaccination.  Petitioner also adds in this affidavit that the previous shoulder injury referred to in Exhibit 2 is the same injury from when he was 14 years old referenced in the previous affidavit.  (Ex. 6, p. 1.)

Petitioner's third supplemental affidavit adds that petitioner "definitely felt left shoulder pain within the first 24 hours after the injection on October 7, 2016, but attributed it to the usual soreness that occurs after a flu vaccination," and that "[t]he pain worsened significantly over the next few weeks with an associated loss in range of motion of the left shoulder."  (Ex. 7, p. 1.)  This affidavit describes that petitioner was sitting when he was vaccinated while the administer was standing and that he does not recall maneuvering his arm in any position while being vaccinated.  (*Id.*)

Petitioner's final affidavit contains a more detailed account of his vaccination, noting that he received the vaccination at his place of employment on October 7, 2016. The following day he experienced pain in his left shoulder, but considered it typical of a flu vaccination and chose to treat it with anti-inflammatory medications and massage. Several weeks later he reports noticing a reduced range of motion in addition to worsening pain, specifically when raising his left arm or reaching behind his back. Petitioner also began to experience trouble sleeping due to his pain.  After several months with no improvement, petitioner made an appointment with Dr. Brennan and received a second opinion from Dr. Schrank.  Petitioner explains that physical therapy worsened his condition, and that after receiving several cortisone shots he considered surgery, but ultimately declined. Petitioner has not sought any additional treatment for his condition and manages his pain and mobility with daily stretching and anti-inflammatory medication (Ex. 10, p. 2.)

## III.   Expert Opinions

### a.  Petitioner's Expert – Naveed Natanzi, D.O.

Petitioner submitted an expert report from physical medicine and rehabilitation specialist Dr. Naveed Natanzi.  (ECF No. 34-2; Ex. 8.)  Dr. Natanzi received his medical degree from Western University of Health Sciences in June of 2012.  (Ex. 9A, p. 2.)  He is board certified by the American Academy of Physical Medicine and Rehabilitation. (*Id.* at 1.)  Dr. Natanzi completed his residency at the University of California, Irvine Physical Medicine and Rehabilitation department.  (*Id.*)  He was previously an attending physician at Bodor Clinic and currently serves as an attending physician at Pasadena Rehab Institute.  Dr. Natanzi also works at Regenerative Sports and Spine Institute, a company he founded in 2017.  (*Id.*)

Dr. Natanzi explains that "most people are unaware that a vaccination can cause significant shoulder dysfunction," so they often fail to associate their post-vaccine

shoulder injuries with vaccinations.  (Ex. 8, p. 7.)  He notes that this often skews observed correlations between shoulder injuries and vaccinations in the medical records of SIRVA cases.  (*Id.*)  However, Dr. Natanzi points out that petitioner described "recent development" of left shoulder pain on November 9, 2016, just one month after his vaccination.  (*Id.*)  Further, Dr. Natanzi cites petitioner's physical therapy records to show that some of petitioner's treating physicians noted onset of his pain in October. (*Id.*)

Dr. Natanzi notes that petitioner's difficulty with overhead activities, positive impingement signs, decreased range of motion with ongoing rotator cuff mediated pains, adhesive capsulitis, and bicipital tendinitis are all "commonly seen in the context of a SIRVA injury."  (*Id.* at 8.)  Dr. Natanzi indicates that petitioner explains in his affidavit that his only prior left shoulder trauma involved a football game when he was 14-years old, and that he had never experienced any left shoulder injuries since.  Dr. Natanzi opines that petitioner's account is corroborated by the lack of any medical records documenting shoulder pain or injuries prior to petitioner's October 2016 flu vaccination.  (Ex. 8, p. 8.)

Dr. Natanzi believes that petitioner experienced "[i]nadvertent overpenetration of the vaccination needle resulting in bursal and rotator cuff penetration causing . . . immediate pain, limited range of motion, and discomfort." And that the "[v]accine [interacted] with naturally-occurring antibodies from a prior vaccination, resulting in an exaggerated, robust, and prolonged inflammatory response [causing] Adhesive capsulitis and rotator cuff mediated pain.  (*Id.* at 9.)  Dr. Natanzi cites a series of case studies on SIRVA which "include one or more of a variety of symptoms and diagnoses . . . [that were] confirmed in [petitioner's] case," to conclude that petitioner likely suffered from a Table SIRVA.  (*Id.* at 9-10.)

### b.  Respondent's Expert – Brian Feeley, M.D.

In response to Dr. Natanzi, respondent filed a report by orthopedic surgeon Dr. Brian Feeley.  (ECF No. 35-1; Ex. A.)  Dr. Feeley received his medical degree from Stanford University in 2001.  (Ex. B, p. 1.)  He is licensed by the state of California, the Drug Enforcement Administration, and certified by the American Board of Orthopaedic Surgery.  (*Id.*)  Dr. Feeley has served as a medical professor at the University of California, San Francisco since 2008, and is Chief of the university's Sports Medicine and Shoulder Service.  (*Id.* at 1-2.)  Dr. Feeley has published over 200 pieces of medical literature including medical journal articles, review articles, and medical textbook chapters.  (*Id.* at 24-39.)

After reviewing petitioner's medical records, Dr. Feeley explains that adhesive capsulitis is evidenced by an initial onset of pain and stiffness while the shoulder becomes very difficult to move over time.  (Ex. A, p. 2.)  It is most prevalent in individuals between 40 and 60 years old, and more common in women than in men. (*Id.* at 2-3) (citing Kiera Kingston, et al. *Shoulder adhesive capsulitis: epidemiology and predictors of surgery*, 27 J. of Shoulder and Elbow Surgery 1437 (2018) (Ex. C).)

The hallmark sign of adhesive capsulitis, according to Dr. Feeley, is the inability to move one's shoulder, either on their own or with assistance.  (*Id.* at 3.)  Dr. Feeley explains that adhesive capsulitis occurs in three stages.  First, there is the "freezing" stage where the pain slowly develops and range of motion decreases over time.  (*Id.*)  The freezing stage typically lasts from six weeks to nine months.  (*Id.*)  Dr. Feeley refers to the second stage as the "frozen" stage where pain may improve, but reduced range of motion persists.  This stage lasts four to six months.  (*Id.*)  Finally, in the remaining six months to two years, the patient will enter the "thawing" stage where motion and any remaining pain slowly resolves.  (Ex. A, p. 3.)

Adhesive capsulitis is a clinical diagnosis typically determined by the hallmark finding of decreased range of motion with no evidence of shoulder osteoarthritis on x-ray or MRI.  (*Id.*)  Dr. Feeley explains that the causes of adhesive capsulitis are not fully understood, but notes that diabetes, hypothyroidism, hyperthyroidism, Parkinson's, and heart disease have all been associated with increased risk.  (*Id.*) (citing Anthony Ewald, *Adhesive Capsulitis: a review*, 83 AM. FAMILY PHYSICIAN 417 (2011) (EX. D).)

According to Dr. Feeley, adhesive capsulitis is usually treated with a combination of physical therapy and corticosteroid injections.  (Ex. A, p. 3) (citing Chung-Yee Cecilia Ho et al., *The effectiveness of manual therapy in the management of musculoskeletal disorders of the shoulder: a systematic review*, 14 MANUAL THERAPY 463 (2009) (EX. E); Wei Wang et al., *Effectiveness of corticosteroid injections in adhesive capsulitis of shoulder*, 96 MED. (BALTIMORE) e7529 (2017) (EX. F).)  Rarely, patients undergo surgery in the form of an arthroscopic debridement.  (*Id.*)  Dr. Feeley concludes that in most cases, adhesive capsulitis completely resolves after two years following onset.  (Ex. A, p. 3) (citing Joseph D. Lamplot et al., *Outcomes From Conservative Treatment of Shoulder Idiopathic Adhesive Capsulitis and Factors Associated With Developing Contralateral Disease*, 9 ORTHOPAEDIC J. OF SPORTS MED. 2325967118785169 (2018) (EX. G).)

Based on petitioner's clinical presentation, Dr. Feeley opines that petitioner likely suffered from adhesive capsulitis.  (*Id.*)  Dr. Feeley's conclusion is specifically based on the fact that petitioner presented with minimal pain and loss of motion; and was diagnosed with impingement which is "a common finding in patients [with frozen shoulder] who are initially mis-diagnosed . . . ."  (Ex. A, pp. 3-4.)  After his initial presentation, petitioner progressively lost range of motion and developed sharp pain in his left shoulder, signs that Dr. Feeley opines are consistent with adhesive capsulitis.  Dr. Feeley also notes that petitioner's treating physicians diagnosed petitioner with adhesive capsulitis, but opines that the temporal association with petitioner's vaccine was likely coincidental.  (*Id.* at 4.)  Finally, Dr. Feeley explains that petitioner's anatomic findings on MRI are inconsistent with those that would be expected in a SIRVA case, but are consistent with non-specific findings seen in frozen shoulder cases.  (*Id.*)

Dr. Feeley notes that a 2017 review of shoulder injuries following vaccination identified  45 reported cases of SIRVA, with a majority of the injuries being diagnosed as bursitis and occurring within 48 hours of vaccination.  (*Id.*) (citing Martín Arias et al.,

*Risk of bursitis and other injuries and dysfunctions of the shoulder following vaccinations*, 35 VACCINE 4870 (2017) (Ex. H).)  Specifically, Dr. Feeley notes that:

> As far as the latency period is concerned, 6 in 8 FEDRA patients complained of increasing severity pain starting within the first 24 h[ours] or few days (4-7) post-vaccination, and 2 reported pain within 2 months.  The systematic review [which identified 37 cases] showed that the patients had immediate pain or pain arising within the first 24 h[ours] post-vaccination in 81.8% of cases, while the remaining 18.9% , they gave pain within the 4 first days.  The pain was of increasing severity and caused shoulder and mobility restriction.

(Ex. A, p. 4) (quoting Arias *supra* at Ex. H.)

Dr. Feeley does note, however, that there is some literature that presents a link between vaccines and frozen shoulder.  In one case review, Saleh et al. observed three cases of vaccine-related frozen shoulder.  (Ex. A, p. 4) (citing Zeina M. Saleh et al., *Onset of Frozen Shoulder Following Pneumococcal and Influenza Vaccinations*, 14 J. OF CHIROPRACTIC MED. 285 (2015) (Ex. I).)  However, Dr. Feeley notes that in these cases, onset occurred within 24 hours.  (*Id.*)  Dr. Feeley cites a second case report by Degreef and Debeer of a patient who experienced adhesive capsulitis with acute onset following flu and Hepatitis A vaccinations.  (Ex. A, p. 4) (citing Lise Degreef & Philippe Debeer, *Post-vaccination Frozen Shoulder Syndrome. Report of 3 cases*, 112 ACTA CHIRURGICA BELGICA 447 (2012) (Ex. J).)  Dr. Feeley further argues that because Black et al. found that shoulder pain was equally common before and after hepatitis A vaccination, "it is not likely that a vaccination causes frozen shoulder."  (Ex. A, p. 4) (citing Steven Black et al., *A post-licensure evaluation of the safety of inactivated hepatitis A vaccine (VAQTA®, Merck) in children and adults*, 22 VACCINE 766 (2004) (Ex. K).)  Finally, Dr. Feeley opines that because Trollomo et al found that intraarticular injections are safe, cause no side effects, and induced immunity, "it strongly suggests that intraarticular injection is safe and [does] not elicit a negative response."  (Ex. A, pp. 4-5) (citing Christina Trollmo et al., *Intra-articular immunization induced strong systemic immune response in humans*, 82 CLINICAL AND EXPERIMENTAL IMMUNOLOGY 384 (1990) (Ex. L).)

Dr. Feeley relies on a statement from the American Academy of Orthopaedic Surgeons ("AAOS") reading in part that "[m]ost of these associations between immunization and shoulder pathology will be coincidental, even if they are perceived as causal."  (Ex. A, p. 5.)  The AAOS concluded that roughly one million people inaccurately associate dormant shoulder conditions with vaccinations.  (*Id.*)  Dr. Feeley believes that the AAOS statement "strongly concludes that there is a high risk of erroneous diagnosis and that vaccine administration is merely coincidental with the onset of common shoulder pathologies."  (*Id.*)

Dr. Feeley agrees with Dr. Natanzi that petitioner's shoulder injury from when he was 14 years old is unrelated to his frozen shoulder.  (*Id.*)  However, Dr. Feeley

explains that the biceps tendonitis observed on petitioner's imaging and exam is "rarely, if ever documented in the [SIRVA] literature."  Further, Dr. Feeley opines that petitioner's MRI only revealed non-specific findings which would be found in many patients.  Finally, although petitioner's subacromial bursitis is consistent with SIRVA, Dr. Feeley believes that if it were vaccine-associated, it would have likely resolved within weeks of the vaccination.  (*Id.*)  Dr. Feeley concludes by explaining that adhesive capsulitis is often attributed to some causal event, but that there is limited evidence suggesting that the injury can be linked to vaccinations.  (*Id.*)

Dr. Feeley also suggests that petitioner's pain did not occur within 48 hours of his vaccination because petitioner did not report pain until one month after vaccination. (Ex. A, p. 6) (citing Gokcan Okur, Kimberly A. Chaney & Laurie M. Lomasney, *Magnetic resonance imaging of abnormal shoulder pain following influenza vaccination*, 43 SKELETAL RADIOLOGY 1325 (2014) (Ex. M).)

Due to the fact that petitioner postponed treatment, showed no signs or symptoms of bursitis at his initial visit, had progressive loss of motion consistent with adhesive capsulitis, and experienced success with treatment for adhesive capsulitis, Dr. Feeley ultimately concludes that instead of a SIRVA, petitioner suffered adhesive capsulitis unrelated to his vaccination.  (Ex. A, p. 6.)

## IV.   Analysis

In this case, petitioner has alleged a "Table Injury."  In these cases, petitioners must show that they suffered an injury associated with the vaccination in question, as described by the Vaccine Injury Table.  If the injury arose within the specified period of time, the vaccination is presumed to have caused the Table Injury.  § 300aa-13(a)(1)(A); § 300 aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).  Petitioner bears a preponderance of the evidence burden of proof. § 300aa-13(a)(1)(A

Petitioner has alleged that he suffered a SIRVA caused by his influenza vaccination.  The Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within 48 hours of administration of an influenza vaccine.  § 300aa-14(a) as amended by 42 C.F.R. § 100.3(a).  The Act's "Qualifications and aids in interpretation" ("QAI") provide specific guidelines used to evaluate Table Injury SIRVA claims.  *See* 42 C.F.R. § 100.3(c)(10).  To demonstrate the presence of a SIRVA, petitioner must show: (i) there is "no history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection"; (ii) that "onset of pain occurred within the specified timeframe," i.e. within 48 hours; (iii) that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered"; and (iv) that "no other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)."  42 C.F.R. § 100.3(a); 42 C.F.R. § 100.3(c)(10).  If petitioner can prove that his injury meets these elements by preponderant evidence, he will be entitled to compensation unless

the government can show the injury was caused by a factor unrelated to vaccination.  §
300aa-13(a)(1)(B).

The process for making determinations in Vaccine Program cases regarding
factual issues begins with consideration of the medical records.  § 300aa-11(c)(2).  The
special master is required to consider "all [ ] relevant medical and scientific evidence
contained in the record," including "any diagnosis, conclusion, medical judgment, or
autopsy or coroner's report which is contained in the record regarding the nature,
causation, and aggravation of the petitioner's illness, disability, injury, condition, or
death," as well as "the results of any diagnostic or evaluative test which are contained in
the record and the summaries and conclusions."  § 300aa-13(b)(1).  However, Special
Masters are not bound by any "diagnosis, conclusion, judgement, test result, report, or
summary" contained in the medical records and must instead reach a decision based on
"the record as a whole" and "consider the record and the course of the injury, disability,
illness, or condition until the date of judgement . . ."  § 300aa-13(a)(1) and (b)(1). The
Special Master "may find the first symptom or manifestation of onset or significant
aggravation of an injury, disability, illness, condition, or death described in a petition
occurred within the time period described in the Vaccine Injury Table even though the
occurrence of such symptom or manifestation was not recorded or was incorrectly
recorded as having occurred outside such period."  § 300aa-13(b)(2).

Medical records ordinarily "warrant consideration as trustworthy evidence."
*Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed.Cir.1993).
Where subsequent testimony conflicts with contemporaneous medical records, special
masters frequently accord more weight to the medical records. *See, e.g., Reusser v.
Sec'y of Health & Human Servs.,* 28 Fed. Cl. 516, 523 (1993) ("[W]ritten documentation
recorded by a disinterested person at or soon after the event at issue is generally more
reliable than the recollection of a party to a lawsuit many years later."); *See also
Vergara v. Sec'y of Health & Human Servs.,* 08-882V, 2014 WL 2795491, *4 (Fed. Cl.
Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to
contemporaneously-recorded medical symptoms than those recorded later in medical
histories, affidavits, or trial testimony."). However, special masters are cautioned against
favoring contemporaneous records "reflexively" and must not overemphasize individual
records at the expense of a comprehensive evaluation of the entire record.  *Shapiro v.
Sec'y of Health & Human Servs.,* 101 Fed. Cl. 532, 539-40 (2011).  "Medical records
are only as accurate as the person providing the information."  *Parcells v. Sec'y of
Health & Human Servs.,* No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr.
July 18, 2006).

There are situations in which compelling oral testimony may be more persuasive
than written records, such as where records are deemed to be incomplete or inaccurate.
*Campbell v. Sec'y of Health & Human Servs.,* 69 Fed.Cl. 775, 779 (2006) ("like any
norm based upon common sense and experience, this rule should not be treated as an
absolute and must yield where the factual predicates for its application are weak or
lacking"); *Lowrie v. Sec'y of Health & Human Servs.,* No. 03–1585V, 2005 WL 6117475,
at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[w]ritten records which are, themselves,

inconsistent, should be accorded less deference than those which are internally consistent") (*quoting Murphy*, 23 Cl.Ct. at 733). However, when witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)), *mot. for rev. denied,* 142 Fed. Cl. 247, 251-52 (2019), *vacated on other grounds and remanded*, 809 Fed. Appx. 843 (Fed Cir. 2020).

### a. No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection

When petitioner first sought treatment for his alleged SIRVA with Dr. Brennan on November 9, 2016, he reported "an old history of trauma to his shoulder." (Ex. 2, p. 1.) However, petitioner explained in his affidavits that this injury occurred when he was 14 years old and resolved without any pain. (Exs. 5-7, 10.) Dr. Brennan recorded the prior shoulder complaint as "recovered nicely" and as having "no pain." (Ex. 2, p. 1.) Additionally, Dr. Brennan confirmed in his Review of Systems that petitioner had no "chronic" joint pain. (*Id*.) Further, both experts in this case agree that petitioner's earlier shoulder injury is unrelated to his frozen shoulder. (*See* Ex. 8, pp. 8-9; Ex. A, p. 5.) Accordingly, I find by preponderant evidence that petitioner had no history of shoulder dysfunction prior to his vaccination that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection.

### b. Onset of pain occurred within the specified timeframe (48 hours)

When petitioner first sought treatment from Dr. Brennan on November 9, 2016, about one month post-vaccination, onset of his shoulder pain was not specifically discussed except to note that petitioner's left shoulder pain began "recently." (Ex. 2, p. 1.) A follow up appointment with Dr. Brennan was entirely silent regarding onset. (*Id*. at 5-8.) Petitioner then sought treatment from Dr. Schrank on March 9, 2017, with a chief complaint of pain and stiffness in the left shoulder. (*Id*. at 9-12.) Dr. Schrank recorded a history of "progressive loss of motion over the past 5 months." (*Id*. at 9.) Five months prior to March 9, 2017, is October 9, 2016, which is two days or 48 hours post-vaccination. Shortly thereafter, petitioner presented for a physical therapy evaluation. (Ex. 3, p. 1.) At that time the history he provided noted that petitioner "noticed onset of pain and stiffness shortly after [receiving] a flu vaccine." (*Id*.) Thereafter, several follow up visits were again silent as to onset. Petitioner averred that the onset of his shoulder pain began "the next day" following his vaccination. (Ex. 10, p. 2.) Upon my review of the complete record, there is not a single encounter record in petitioner's medical

records that is incompatible with onset of shoulder pain occurring within 48 hours of vaccination.[4]

In light of the above, there is preponderant evidence that onset of petitioner's left shoulder pain began within 48 hours of petitioner's October 7, 2016 flu vaccination. Respondent offers several arguments to the contrary, but, especially in the context of this record, these arguments would have the effect of elevating petitioner's burden above a preponderance of the evidence.

Respondent argues that "there are no objective findings from a treating medical professional documenting the presence of shoulder pain in the 48 hours following vaccination." (ECF No. 42, p. 10.)  Respondent acknowledges that some of petitioner's medical records directly relate onset of his pain to "shortly after" his vaccination but dismisses this as a belated "self-report." (*Id.*)  Respondent's argument is inconsistent with the Vaccine Act insofar as the statute instructs that the special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such a period." §300aa-13(b)(2).  Moreover, the Federal Circuit has observed, albeit in a different context, that "[i]ndeed, for many medical symptoms or events – such as a headache *and other pain*, dizziness, nausea, and vomiting – the patient's or a parent's testimony may be the best, or only, direct evidence of their occurrence. Medical records related to those symptoms would likely be based on the statements of those who experienced them." *James-Cornelius on Behalf of E. J. v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021) (emphasis added).  Years of adjudicating SIRVA claims demonstrates that respondent's search for objective findings within 48 hours of vaccination is not reflective of real-world medical care.  *E.g. Smallwood v. Sec'y of Health & Human Servs.*, No. 18-291, 2020 WL 2954958, at *10 (Fed Cl. Spec. Mstr. Apr. 29, 2020) (Chief Special Master noting that "[i]t is often common for a SIRVA petitioner to delay treatment, thinking his/her injury will resolve on its own.")

Respondent also argues that petitioner's testimonial evidence is "at odds" with his medical records and prior affidavits in that he averred in later affidavits that onset of his shoulder pain began within 24 hours of vaccination whereas the prior records and affidavits were silent as to any connection between his injury and vaccination. (ECF No. 42, pp. 10-11.)  Respondent stresses that "contemporaneous medical records should generally be accorded more weight than testimony, particularly conflicting testimony." (*Id.* at 10.)  Respondent is correct that contemporaneous medical records are deserving of significant weight.  Respondent is incorrect, however, that petitioner's testimony is "at odds" with his contemporaneous medical records.  It is well established in this program that medical records must be interpreted with the understanding that they "typically

[4] Petitioner's physical therapy record does include a notation indicating that onset was "10/15/2016," which would be about one week post-vaccination. (Ex. 3, p. 1.)  However, the more detailed history of present illness identifies onset as occurring "shortly after" the flu vaccine without identifying the date of vaccination or discussing a date certain for onset.  Considering the physical therapy record as a whole and in the context of the record as a whole, the descriptive portion of the document, which places onset in relation to vaccination, carries more weight than the specific onset date that is otherwise unexplained.

record only a fraction of all that occurs." *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (quoting *Clark v. Sec'y of Health & Human Servs.*, No. 90-45V, slip op. at 3, 1991 WL 57051 (Cl. Ct. Spec. Mstr. Mar. 28, 1991).)  Accordingly, "the fact that reference to an event is omitted from the medical records may not be very significant." *Id.*  There is no presumption that medical records are complete. *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).  The fact that many of petitioner's medical records failed to make any notation as to onset at all is much less significant than if those records had contained a notation of onset occurring at some other time.  Respondent stresses the number of instances where onset is not recorded (ECF No. 42, p. 11 (citing seven orthopedic visits at Ex. 2, pp. 1-3 5, 9, 13, 15, 18, 20, 23, 25)); however, most of the encounters cited by respondent are follow up appointments with the same medical provider, making it far more likely that the omission would be carried forward and far less likely that initial onset would be revisited.

Notably, however, petitioner's medical records are not entirely silent regarding onset.  Respondent rejects notations such as "recently," "over the past 5 months," or "shortly after" vaccination, as inadequate descriptors because they "do not specify that the pain began within 48 hours of vaccination." (ECF No. 42, p. 11.)  However, the fact that the medical records are imprecise does not automatically render them contradictory to petitioner's more specific testimony.  Nor should respondent have the expectation that patients or treating physicians will specifically conform their language to the precise terms of the Vaccine Injury Table.  If petitioner reported to his physical therapist that pain began "the next day" following his vaccination as stated in his affidavit (Ex. 10, p. 2) that is easily paraphrased to "shortly after" vaccination as appears in his medical record (Ex. 3, p. 1).  Without more, it is not reasonable to parse these two statements as being inconsistent.  And, as noted above, petitioner's March 9, 2017 report of a 5-month history of symptoms does place onset at 48 hours post-vaccination as a matter of timing regardless of whether vaccination was specifically referenced.  (Ex. 2, p. 9.)  Upon consideration of this record as a whole, my conclusion is that petitioner's medical records, while vague, are in harmony with petitioner's affidavit testimony and adequate to place onset of shoulder pain within 48 hours of vaccination when combined with petitioner's sworn statement.  *Accord Williams v. Sec'y of Health & Human Servs.*, No. 17-1046V, 2020 WL 3579763, at *5 (Fed. Cl. Spec. Mstr. Apr. 1, 2020) (finding that "based on the record as a whole, I find the notations characterizing onset as 'since,' 'after receiving,' 'following', and 'very soon after' injection are best understood as indicating onset was effectively immediate, or within 48 hours of, vaccination.")

Respondent also makes two additional arguments going specifically to the weight of petitioner's affidavit testimony.  First, respondent argues that petitioner's March 21, 2017 report to his physical therapist came about because petitioner had conducted his own research into the possible causes of his shoulder pain. (ECF No. 42, p. 11 (citing Ex. 10, p. 2).)  Notably, however, petitioner's contemporaneous medical records contain some evidence placing onset at about the time of vaccination even prior to the point at which petitioner specifically invoked his vaccination as a possible cause of his pain to his physical therapist. (*See* Ex. 2, p. 9 (reporting 5-month history of symptoms on March 9, 2017) and Ex. 2, p. 1 (characterizing onset as "recent" as opposed to chronic as of

13

November 9, 2016).)  And, in any event, respondent has not articulated why the fact of petitioner having conducted research into the causes of his shoulder pain is suspect on this record.  *Accord Smallwood*, 2020 WL 2954958 at *10 (noting that "[r]espondent references [p]etitioner's internet search as evidence which undermines his claim of a SIRVA injury. However, it is logical to assume [p]etitioner may have discounted his shoulder injury until educating himself through interest research regarding SIRVA.")

Second, respondent argues that petitioner's recollection is unreliable because his last affidavit suggests confusion as to the dates of certain medical appointments. (ECF No. 42, p. 11.)  The affidavit at issue was signed in April of 2020, more than three years after the events described.  Respondent is correct that this has some bearing on the reliability of petitioner's overall recollection.  However, recalling the dates of specific medical appointments is not necessarily comparable to recalling the date a painful injury occurred. And, in any event, for all the reasons discussed above, petitioner's specific recollection that onset of his shoulder pain began the day after his vaccination is corroborated by contemporaneous medical records and the outcome in this case does not turn exclusively on petitioner's recollection

Respondent's expert also relies on petitioner's one-month delay in seeking treatment to suggest that petitioner's onset was outside the 48-hour SIRVA window. (Ex. A, p. 6.)  However, prior decisions by myself and other special masters have found that postponing treatment for a limited time is not *per se* dispositive of when onset occurred.  *See e.g.*, *Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272 (Fed. Cl. Spec. Mstr. Dec. 11, 2020); *Forman-Franco v. Sec'y of Health & Human Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018); *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied* 142 Fed. Cl. 329 (2019); and *Gurney v. Sec'y of Health & Human Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Spec. Mstr. Mar. 19, 2019).  When delays in seeking treatment have contributed to dismissals of SIRVA claims, it was usually because the existing contemporaneous medical records were inconsistent with petitioner's allegation of immediate post-vaccination onset.  *See e.g.*, *Lavender v. Sec'y of Health & Human Servs.*, No. 18-1921V, 2021 WL 667187 at *9-11 (Fed. Cl. Spec. Mstr. Jan. 25, 2021); *Small v. Sec'y of Health & Human Servs.*, No. 15-478V, 2019 WL 6463985, at *11 (Fed. Cl. Spec. Mstr. Nov. 1, 2019), *review denied*, 2020 WL 918799 (Fed. Cl. Jan. 27, 2020); *Demitor v. Sec'y of Health & Human Servs.*, No. 17-564V, 2019 WL 5688822, at *10 (Fed. Cl. Spec. Mstr. Oct. 9, 2019).  Delays in seeking treatment have also contributed to dismissals when petitioners have failed to report their symptoms at doctor visits for extended periods following their vaccination.  *See, e.g.*, *Duesterheft v. Sec'y of Health & Human Servs.*, No. 18-08V, 2021 WL 1097707 at *6-9(Fed. Cl. Spec. Mstr. Feb. 24, 2021); *see also Small, supra*. Here, however, I do not find that petitioner's initial pattern of treatment constituted any meaningful delay in seeking treatment.  Petitioner only waited one month before seeking treatment, he was not seen by any other healthcare providers between his vaccination and reporting his shoulder pain to Dr. Brennan, and he did not submit any records which contradict his allegation of onset.

Accordingly, I find by preponderant evidence that petitioner's shoulder pain occurred within 48 hours of his October 7, 2016 flu vaccination.

c. **Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered**

Respondent does not dispute that petitioner's pain and reduced range of motion were confined to his left shoulder. Petitioner's medical records are clear on this question as well. None of petitioner's medical records identify any other musculoskeletal complaint. Nor do any of petitioner's medical records suggest the presence of any other type of problem, such as radiculopathy from the neck, that could indicate a different etiology for petitioner's shoulder pain. Dr. Feeley likewise did not identify any suspicion that petitioner's pain and reduced range of motion extended beyond his left shoulder. Thus, I find that there is preponderant evidence showing that petitioner experienced pain and reduced range of motion confined to his left shoulder.

d. **No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)**

It is undisputed that petitioner was diagnosed with and suffered from adhesive capsulitis subsequent to vaccination. Petitioner and respondent agree on this point, as do petitioner's treating physicians, and the experts in this case. (*See* ECF No. 40, pp. 2-4; ECF No. 42, pp. 12-13; Ex. 2, pp. 11, 30; Ex. 3, p. 2; Ex. A, pp. 3-4; Ex. 8, p. 9.) Respondent has not identified any other condition, apart from adhesive capsulitis, that could explain petitioner's symptoms.[5] Nonetheless, respondent argues incorrectly that because petitioner's condition is explained by his adhesive capsulitis diagnosis, he is therefore disqualified from claiming a Table SIRVA. (ECF No. 42, p. 12.)

As respondent stresses, "SIRVA is an injury defined by administrative rulemaking" (ECF No. 42, p. 13) rather than constituting a medical diagnosis in itself.[6] Although deltoid bursitis is the specific condition that has been most clearly associated with vaccine-related shoulder injuries, the QAI definition of SIRVA was specifically drafted to encompass shoulder dysfunction beyond that condition. Because SIRVA is by definition, an unspecified "injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.)," the term encompasses a variety of more specific shoulder injuries and cannot be limited to bursitis. *See* 42 C.F.R. §100.3(c)(10). In fact, the proposed rulemaking defining SIRVA specifically includes adhesive

---

[5] There was a reference in petitioner's medical records to a SLAP tear, but respondent did not argue that this condition explains petitioner's symptoms and further conceded that the presence of a SLAP tear was not supported by petitioner's MRI. (ECF No. 42, p. 12, n. 9.)

[6] This may, in fact, be changing. Although the most common expectation is that those suffering SIRVA will be diagnosed with specific shoulder pathologies rather than "SIRVA," in some instances the "SIRVA" concept is being used by treating physicians as a diagnosis. *See Lang*, 2020 WL 7873272 at n. 3.

capsulitis as a condition falling within the scope of "SIRVA."[7]  Proposed Rulemaking, 2015 WL 4538923, at *45136; *See also Gurney v. Sec'y of Health & Human Servs.*, No.17-481V, 2019 WL 2865490, at *7 (Fed. Cl. Spec. Mstr. Apr. 24, 2019) (finding that "the timing and course of petitioner's adhesive capsulitis remains consistent with a post-vaccination sequela to her SIRVA as described in the [Atanasoff study] and as envisioned by the rulemaking which created SIRVA as a Table Injury.").

Although I previously noted that findings of shoulder dysfunction beyond deltoid bursitis do not *per se* defeat a SIRVA claim, I also acknowledged that may theoretically be possible for evidence of shoulder dysfunction to be incompatible with SIRVA.  *Lang*, 2020 WL 7873272 at *12-14 (finding that evidence of impingement syndrome is compatible with SIRVA.  In that context, however, I suggested that the question would become "whether petitioner's own clinical history indicates that [the] shoulder pathology wholly explains [the] symptoms independent of vaccination." *Id*. at *13.

Here, apart from the timing of initial onset, which is addressed separately above, neither respondent nor Dr. Feeley have suggested that petitioner's own clinical presentation of adhesive capsulitis is in itself incompatible with SIRVA or SIRVA sequela.[8]  Rather, Dr. Feeley contends that petitioner's adhesive capsulitis is likely "coincidental" to vaccination because there is only limited scientific literature linking adhesive capsulitis to vaccination and adhesive capsulitis is an otherwise known medical condition. (Ex. A, pp. 2-4.)  Respondent in turn argues:

---

[7]  Respondent's proposed rulemaking stated in relevant part:

> The IOM reviewed the scientific and medical literature finding evidence that convincingly supports a causal relationship between vaccine injection (with a needle) into an arm and deltoid bursitis. The report noted that the published VICP case series (Atanasoff et al.), as described, were clinically consistent with deltoid bursitis. The VICP case series found that 93 percent of patients had the onset of shoulder pain within 24 hours of vaccine administration and 54 percent had immediate pain following vaccine injection. *The VICP case series found several diagnoses, beyond deltoid bursitis, that resulted in shoulder pain following vaccination, including tendonitis, impingement syndrome, frozen shoulder syndrome, and adhesive capsulitis.* Another case series reported two cases of shoulder pain, weakness and reduced range of motion following vaccination with onset of symptoms within 48 hours of vaccination. [Bodor M, Montalvo E, Vaccination related shoulder dysfunction, Vaccine 25(2007) 585-587.] *In order to capture the broader array of potential injuries, the Secretary proposes to add SIRVA for [certain influenza] vaccines that are administered intramuscularly through percutaneous injection into the upper arm.*

Proposed Rulemaking, 2015 WL 4538923, at *45136 (emphasis added).

[8] Dr. Feeley does indicate that "[t]he other anatomic findings of the shoulder MRI do not correlate to findings that would be expected in a SIRVA case, but are consistent with the nonspecific findings seen in frozen shoulder." (Ex. A, p. 4.)  Again, however, although Dr. Feeley is discussing petitioner's own MRI, his conclusion is based on the broader idea that adhesive capsulitis is fundamentally a separate phenomenon that cannot overlap with SIRVA, a proposition that is not supported by respondent's rulemaking or prior program caselaw.  The fact that Dr. Feeley agrees petitioner's MRI is consistent with adhesive capsulitis supports rather than defeats petitioner's Table Injury claim.  Proposed Rulemaking, 2015 WL 4538923, at *45136.   In any event, under the terms of the QAI, no specific MRI findings have been identified as necessary to demonstrating the presence of a SIRVA.

> [A]s explained by the recent position statement of the American Academy of Orthopedic Surgeons quoted by Dr. Feely in his report, given the prevalence of both vaccinations and shoulder pathologies, there is a high risk that individuals like petitioner, who first notice shoulder pain at some point after receiving a vaccination, may misperceive their symptoms as new and inaccurately believe that the vaccination was the cause of their shoulder injury. Petitioner does not address the issue of frozen shoulder or refute Dr. Feeley's conclusions in the context of his Table claim.  He therefore has not substantiated his assertion that there was no other condition present that would explain his symptoms.

(ECF No. 42, pp. 12-13 (internal citations omitted).)  In the present context, this argument by respondent nonsensically seeks to place a burden upon petitioner to prove a causal relationship between his vaccination and the injury constituting his Table Injury claim in order to be able to benefit from the causal presumption he is entitled to under the terms of the Vaccine Injury Table.

In light of the above, I find by preponderant evidence that no other condition or abnormality is present that would explain the petitioner's post-vaccination symptoms.

### e.  Factors unrelated to vaccination

Once petitioner has met his *prima facie* burden of demonstrating a Table Injury, respondent may still prove the condition is "due to factors unrelated to the administration of the vaccine described in the petition."  § 300aa-13(a)(1)(B).  In this case, respondent has not raised any issue of factors unrelated to vaccination apart from what is discussed above.

### V.    Conclusion

For all the reasons discussed above, after weighing the evidence of record within the context of this program, I find by preponderant evidence that petitioner suffered a Table Injury of SIRVA following his October 7, 2016 flu vaccination as alleged.  A separate damages order will be issued.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master
